No. 25-1397 (L); 25-1398

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JEFFERSON GRIFFIN,

*Plaintiff-Appellee,*

*v.*

NORTH CAROLINA STATE BOARD OF ELECTIONS,

*Defendant-Appellant,*

and

ALLISON RIGGS, NORTH CAROLINA ALLIANCE FOR RETIRED
AMERICANS, VOTEVETS ACTION FUND, TANYA WEBSTER-
DURHAM, SARAH SMITH, AND JUANITA ANDERSON,

*Intervenor-Appellants.*

On Appeal from the United States District Court
for the Eastern District of North Carolina

## VOTEVETS ACTION FUND, NORTH CAROLINA ALLIANCE
## FOR RETIRED AMERICANS, TANYA WEBSTER-DURHAM,
## SARAH SMITH, AND JUANITA ANDERSON'S EMERGENCY
## MOTION FOR INJUNCTION PENDING APPEAL

NARENDRA K. GHOSH
PATTERSON HARKAVY LLP
100 EUROPA DRIVE, STE 420
CHAPEL HILL, NC 27217
(919) 942-5200

LALITHA D. MADDURI
CHRISTOPHER D. DODGE
TINA MENG MORRISON
JAMES J. PINCHAK
JULIE ZUCKERBROD
ELIAS LAW GROUP LLP
250 MASSACHUSETTS AVE, N.W., STE 400
WASHINGTON, D.C. 20001
(202) 968-4490

## Table of Contents

INTRODUCTION ............................................................. 1

BACKGROUND ............................................................. 5

LEGAL STANDARD ......................................................... 5

ARGUMENT ................................................................. 6

I.  Voter Appellants are likely to prevail on the merits. ..................... 6

    A.  The state court orders violate the Due Proess Clause. .......... 6

    B.  The state court orders violate the Equal Protection Clause. ................................................................. 11

    C.  The state court orders violate the First and Fourtheen Amendments to the Constitution. ......................................... 15

II.  Voter Appellants will be irreparably harmed absent an injunction. ................................................................. 17

III.  The balance of equities favor an injunction. ................................. 21

CONCLUSION ............................................................. 22

## LOCAL RULE 27(a) STATEMENT

Pursuant to Local Rule 27(a), Plaintiff-Appellee Jefferson Griffin opposes this motion. Defendant North Carolina State Board of Elections consents to the requested relief and intends to file a response.

## INTRODUCTION

Over five months ago, millions of North Carolina voters cast their ballots in accordance with longstanding and clear election rules. Each of those voters had every reason to expect their vote would count. None could have foretold that—nearly *half a year later*—they would be disenfranchised, all due to the ongoing crusade of one disaffected candidate—Judge Jefferson Griffin—to reverse his defeat at the ballot box. The federal constitution's guarantees of due process, equal protection, and the right to vote clearly bar Griffin's demand that a targeted subset of voters comply with a "cure" process ordered by state courts months after an election based on post-election state law rulings no voter could have foreseen. Worse yet, many of the targeted voters are serving in our military, and all of them indisputably obeyed election rules as they existed on election day.

Griffin's legal saga now returns to this Court at a particularly odd juncture. The district court has declined to temporarily enjoin the cure process ordered by state courts, which forces the North Carolina State Board of Elections ("Board") to commence an unconstitutional cure process; at the same time, that cure process, along with the state courts'

1

orders, are currently subject to federal judicial review, as contemplated by this Court, and could be imminently invalidated. *See* Per Curium Op. at 11, *Griffin v. N.C. State Bd. of Elections*, No. 25-1018 (4th Cir. Feb. 4, 2025), ECF No. 132 (unpublished). As such, the Board should not be permitted to send notices initiating a 30-day cure process that federal review stands to obviate—particularly when the state courts' orders create "obvious conflicts with federal law" that must be resolved. *Griffin v. N.C. State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903, at *4 n.2 (N.C. Apr. 11, 2025) (Earls, J., concurring in part and dissenting in part); *see* Board Notice, *Griffin v. N.C. State Bd. of Elections,* 5:24-cv-731 (E.D.N.C. Apr. 15, 2025) ("*Griffin II*"), ECF No. 61 at 5-6 ("Board Notice").

Once the federal issues in this case are decided, the unconstitutionality of the state courts' orders—and the superfluity of a cure process—will be clear. This case presents an extraordinarily simple question of federal law: Can a losing candidate change the rules of the election *after* he loses it? The answer is no. *See Hendon v. N.C State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983). It is equally clear that North Carolina may not "by later arbitrary and disparate treatment, value one person's vote over that of another," which is precisely what the

state-court-ordered cure process requires. *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam). Moreover, discarding ballots that voters cast in reliance on the state's assurances unconstitutionally burdens the right to vote. The strong likelihood that VoteVets Action Fund ("VoteVets"), the North Carolina Alliance for Retired Americans ("Alliance"), and individual Alliance members targeted by Griffin's protests ("Voter Appellants") will prevail on their yet unheard federal arguments requires temporarily enjoining any imminent efforts to implement a cure.[1]

The balance of equities overwhelmingly weighs in favor of an injunction that ensures federal review finishes before voters are informed they need to cure their ballot. Imposing such an unconstitutional process on voters is itself irreparable harm. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("*LWV*"). Moreover, this process will yield tainted results, along with irreversible confusion and disruption on Voter Appellants, their constituents and supporters, and the public—especially because the Board's cure notices will explicitly

---

[1] Voter Appellants intervened in both *Griffin v. N.C. State Bd. of Elections*, No. 5:24-cv-724 (E.D.N.C.) ("*Griffin I*") and *Griffin II*. *See* Text Order, *Griffin I* (E.D.N.C. Dec. 26, 2024); Ct. Order, *Griffin v. N.C. State Bd. of Elections*, No. 25-1020, (4th Cir. Feb. 4, 2025), ECF No. 31.

3

note "that [] litigation is ongoing and the voter's obligations [to cure] are subject to change." Board Notice at 6. What is more, the cure process will subject subsets of identically-situated voters to disparate treatment based solely on their county of residence. Such arbitrary impositions on the right to vote will leave lasting harm, disillusion voters, and cast doubt on the fundamental fairness of North Carolina's elections. The equities thus favor first resolving federal questions at this juncture.

Prematurely sending out notices that start the 30-day cure window will cause further irreparable harm by requiring organizations like VoteVets—a group dedicated to enfranchising domestic and overseas servicemembers currently targeted by the cure—to rapidly deploy scarce resources to support voters in the cure process. Once spent, these resources cannot be recouped. The same is true for the public's resources.

Voter Appellants therefore ask this Court to enjoin the Board from issuing notices to voters that trigger the 30-day cure clock until all federal questions have been resolved including, if necessary, by this Court.[2]

---

[2] Voter Appellants do not seek to enjoin the Board from taking preparatory steps for a cure process; only those actions that would begin the 30-day cure period, like issuing formal notice to voters.

## BACKGROUND

Voter Appellants join and incorporate by reference the Background section in Justice Riggs's Emergency Motion for Stay and Injunction Pending Appeal, ECF No. 5.

## LEGAL STANDARD

Because the district court has now twice denied requests to temporarily enjoin the court-ordered cure process, Voter Appellants move for that relief before this Court pursuant to Fed. R. App. P. 8(a)(2)(A)(ii). Appellants are entitled to an injunction pending appeal if they show they are likely to succeed on the merits; they will be irreparably injured absent a stay; the equitable balance favors a stay; and a stay benefits the public. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (discussing stay pending appeal); *Grimmett v. Freeman*, No. 22-1844, 2022 WL 3696689, at *1 (4th Cir. Aug. 25, 2022) (applying *Nken* factors and granting injunction pending appeal).[3]

---

[3] Voter Appellants' motion seeks an injunction pending appeal because the district court stated that it did not issue a mandatory injunction against the Board but instead declined to enjoin the cure process ordered by the North Carolina courts. *See Griffin II*, ECF No. 60. This motion could also be considered as a motion to stay, however, because the state

# ARGUMENT

## I. Voter Appellants are likely to prevail on the merits.

### A. The state court orders violate the Due Proess Clause.

The two outstanding groups of voters who Griffin seeks to disenfranchise indisputably followed applicable election rules and instructions as they existed on election day 2024.[4] The federal constitution's guarantee of substantive due process prohibits disenfranchising these voters, regardless of any post hoc cure procedure.

This doctrine was first articulated in a factually analogous case, where the First Circuit held it was unconstitutional to discard votes after

---

court orders requiring the Board to implement a cure are now the district court's own. *See* 28 U.S.C. § 1450. The standard under Rule 8 is the same either way. *See Nken*, 556 U.S. at 434.

[4] Griffin challenged 1,409 voters in Guilford County who voted under the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") and complied with all applicable rules for returning their absentee ballots. Griffin argues these voters should have provided photo identification with their ballots, notwithstanding that the Board has expressly exempted UOCAVA voters from this requirement since at least 2020 ("UOCAVA Challenge"). *See* 8 N.C. Admin. Code 17.0109.

Griffin also challenged the ballots of 266 citizens living abroad who are entitled to vote under the Uniform Military and Overseas Voters Act ("UMOVA"), a law enacted *unanimously* by the Legislature and implemented without incident in dozens of elections over more than a decade ("UMOVA Challenge"). N.C.G.S. § 163-258.1, *et seq*.

an election concluded where voters had reasonably relied upon election rules that were only *later* deemed unlawful by a state court. *See Griffin v. Burns*, 570 F.2d 1065, 1067, 1074 (1st Cir. 1978). In *Griffin*, officials distributed absentee ballots for a primary election in Rhode Island. *Id.* at 1067. A losing candidate later challenged these ballots on the theory that Rhode Island law did not permit absentee voting in primary elections, notwithstanding years of contrary practice. *Id.* at 1067-68. After a divided state supreme court agreed with the losing candidate's interpretation of state law and invalidated the ballots, voters sued in federal court to preserve their ballots. *Id.* at 1068.

The First Circuit ruled for the voters, finding "Rhode Island could not, constitutionally, invalidate the absentee . . . ballots that state officials had offered to the voters in this primary, where the effect of the state's action had been to induce the voters to vote by this means rather than in person." *Id.* at 1074. The court recognized that discarding ballots where voters simply followed the rules given to them would be a "fundamental unfairness," resulting in a "flawed [electoral] process." *Id.* at 1076-77. As here, voters "were doing no more than following the instructions of the officials charged with running the election," and it was

7

unreasonable to expect individual voters to "at their peril, somehow . . . foresee" a future interpretation of state law that would invalidate their ballots after-the-fact. *Id.* at 1075-76. To disenfranchise such law-abiding, good faith voters would "present[] a due process violation." *Id.* at 1078.

These due process principles are "settled" law within this Circuit, *Hendon*, 710 F.2d at 182 (citing *Griffin*, 570 F.2d at 1077), alongside many others, *e.g., Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 98 (2d Cir. 2005) (citing *Griffin*, 570 F.2d at 1077); *Roe v. Alabama*, 43 F.3d 574, 581 (11th Cir. 1995) (citing *Griffin*, 570 F.2d at 1075). Simply put, due process prohibits rejecting ballots where "state actions . . . induce[d] voters to miscast their votes." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (citing *Griffin*, 570 F.2d at 1074, 1078-79).

Distilling *Griffin*, the Ninth Circuit has held a due process violation occurs where there is "(1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures." *Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998)

8

(noting *Griffin's* concern with "the massive ex post disenfranchisement" of voters who would have no reason to suspect any infirmity with their vote). Voter Appellants are likely to show these factors are met.

Voters subject to Griffin's UOCAVA ID Challenge cast ballots in accordance with a rule first promulgated by the Board in 2020. *See* 8 N.C. Admin. Code 17.0109(d). These voters plainly relied upon "an established election procedure and/or official pronouncement[]" as to how to vote from abroad. *Bennett*, 140 F.3d 1226-27. And any change in that procedure *now* will result in "significant disenfranchisement." *Id.* at 1227; *see infra* Section II; *see generally* Ex. A, Eaton Decl. [5]

That some of these voters may have a chance to rehabilitate their votes does not cure the constitutional infirmities. These voters' ballots have been declared invalid, unlawfully "undo[ing] the ballot results in a court action." *Hendon*, 710 F.2d at 182 (citation omitted). Being subjected to a post hoc process requiring them to jump through new hoops and abide by new rules that did not exist at the time of the election is itself

---

[5] Major General Paul Eaton's declaration was submitted to the district court in *Griffin II* in support Voter Appellants' motion for a stay of the district court's order. *See Griffin II*, ECF No. 58.

unconstitutional. *Cf. LWV*, 769 F.3d at 247 (concluding that requiring voters to vote pursuant to "[d]iscriminatory" voting procedures are precisely "the kind of serious violation of the Constitution" that courts will enjoin. (citation omitted)). The voters needing to cure, moreover, are Americans serving in the military or located overseas, compounding the likelihood of disenfranchisement. *See* Eaton Decl. ¶ 10.

Those voters targeted by the UMOVA Challenge voted under an even longer-standing rule, enacted by the Legislature in 2011 without a single opposing vote. *See* N.C.G.S. § 163-258.2(1)(e). These voters also indisputably acted in reliance on an established election rule and will be disenfranchised. *Bennett*, 140 F.3d at 1226-27.[6]

It would be a gross injustice to punish any of these voters—many of them servicemembers or their families—for "state actions" that "induce[d]" them to allegedly "miscast their votes." *Husted*, 696 F.3d at 597; *see also Hendon*, 710 F.2d at 182 (applying the "general rule that

---

[6] It is not even clear these voters are ineligible to vote under North Carolina law as the state courts have interpreted it. Recent analysis shows that many individuals in this category—who purportedly never resided in North Carolina—*currently* or have previously lived in the state. *See* Board Notice at n.6.

denies relief with respect to past elections" and rejecting challenge to long-existing election regulations). The Board should be enjoined from sending notices to voters that would trigger the 30-day cure window until the constitutionality of the cure process is finally determined. *See* Board Notice at 5-6.[7]

### B. The state court orders violate the Equal Protection Clause.

The U.S. Supreme Court has made clear "[h]aving once granted the right to vote on equal terms," a state "may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05. At issue in *Bush* was the "uneven treatment" of voters in different Florida counties due to "varying [post-election] standards to

---

[7] For similar reasons, there is a strong likelihood that any cure program imposed on voters at this point would also violate procedural due process because there cannot be sufficient procedural safeguards in place to ensure that voters—especially deployed military voters and voters overseas—will receive proper notice and have sufficient opportunity to cure their ballots on time. *See United States v. White*, 927 F.3d 257, 263 (4th Cir. 2019); *see also Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Certain UMOVA Challenge voters may also never receive notice or opportunity to be heard whatsoever before being disenfranchised. *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 226 (M.D.N.C. 2020) (holding voters suffer a procedural due process violation "if election officials reject their ballots" without being "notified or afforded any opportunity to respond").

11

determine what was a legal vote," imposed by Florida's Supreme Court *Id.* at 107. The Supreme Court held that standards used to discern voter intent violated equal protection where they "var[ied]" from "county to county." *Id.* at 106. A state's "arbitrary and disparate treatment to voters in its different counties," the Supreme Court noted, is "hostile to the one man, one vote basis of our representative government." *Id.* at 107 (citation omitted).

This case mirrors *Bush* as it too concerns whether North Carolina courts can issue post-election orders forcing UOCAVA voters registered in one, but not all, counties to provide a photo ID when voting absentee. *Griffin v. N. Carolina State Bd. of Elections*, No. 320P24-3, 2025 WL 1090903, at *4 n.2 (N.C. Apr. 11, 2025) (Earls, J., concurring in part and dissenting in part) (noting this process creates "obvious conflicts" with "the principles relied upon in *Bush v. Gore*"); *see also id.* at *18 (Dietz, J., concurring in part and dissenting in part) (noting the probable "conflict" with *Bush*). Among the 32,033 UOCAVA voters in the election, the state courts' orders affect only the 1,409 UOCAVA voters from Guilford County—plainly amounting to "uneven treatment," violating the "minimum requirement for nonarbitrary treatment of voters." *Bush*, 531

12

U.S. at 105, 107; Board Notice at 2. "Whether an individual's vote will be counted in this race, therefore, may depend in part on something completely arbitrary—their place of residence." *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 47 (S.D.N.Y. 2020). And the reality is far more troubling than "arbitrary." Griffin "discriminat[ed] by residence" by naming counties that went for Justice Riggs "by significant margins." *Griffin v. N.C. State Bd. of Elections*, No. COA25-181, 2025 WL 1021724, at *41 n.23 (N.C. Ct. App. Apr. 4, 2025) (Hampson, J., dissenting).[8]

*Bush's* core holding—that elections carry with them "rudimentary requirements of equal treatment and fundamental fairness"—is longstanding. *Bush*, 531 U.S. at 109; *see Baker v. Carr* 369 U.S. 186, 208 (1962) (holding that a "citizen's right to a vote free of arbitrary impairment by state action" is offended when such impairment results from "a refusal to count votes from arbitrarily selected precincts"); *cf. Reynolds v. Sims*, 377 U.S. 533, 568 (1964) ("A citizen, a qualified voter,

---

[8] As noted in the Board's Notice, Griffin timely challenged UOCAVA voters in only Guilford County. After the filing deadline, Griffin sought to add challenges to ballots cast in Durham, Forsyth, and Buncombe Counties. *See* Board Notice at 2 n.2.

is no more nor no less so because he lives in the city or on the farm."). These deep, historical roots explain why courts do "not hesitate to apply" the "general principle that *Bush* applied"—that "'the rudimentary requirements of equal treatment and fundamental fairness' prohibits states from engaging in wholly 'arbitrary and disparate treatment' of members of the public." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 730 (9th Cir. 2025) (citation omitted); *see also Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016) (similar).

The cure process also violates equal protection for a separate reason: the results of any cure program will turn on arbitrary circumstances unrelated to voters' qualifications. Despite having followed the rules prescribed, voters who do not receive notice from election officials due to change of address, deployment, travel, death, or some other legitimate reason will have their votes thrown away based on random chance. This process, under which "arbitrary factors" lead to the "valuing [of] one person's vote over that of another," is precisely "the kind of process specifically prohibited by the Supreme Court." *Gallagher*, 477 F. Supp. 3d at 48.

14

What set the North Carolina state courts' remedy on a collision course with *Bush* was not just its varying standards; this is not a case about whether "local entities, in the exercise of their expertise," can "develop[] different systems for implementing elections." *Bush*, 531 U.S. at 109. The state court remedy here, like in *Bush*, is unconstitutional because, unlike any individual county, the Supreme Court of North Carolina had "the power to assure" equal treatment for its citizens, *id.*, by rejecting Griffin's challenges and applying its interpretation of state law prospectively. Instead, it applied its remedy retrospectively, and selectively, and in doing so, it "ratified" unconstitutional, "uneven treatment.*" Id.* at 107.

### C.    The state court orders violate the First and Fourteen Amendments to the Constitution.

The requirement that rule-abiding voters retroactively "cure" an alleged defect with their ballot constitutes a post-election change to the state's election laws and practices that severely burdens the right to vote. Under the applicable *Anderson-Burdick* test, the Court must "weigh[] the severity of the burden the challenged [practice] imposes on a person's constitutional rights against the importance of the state's interests

15

supporting that law." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 713 (4th Cir. 2016) (citations omitted). Where a challenged process severely burdens voters' rights, it can only survive if it is narrowly drawn to advance a compelling state interest. *See Fusaro v. Cogan*, 930 F.3d 241, 257-58 (4th Cir. 2019).

Some UOCAVA voters' ballots are now invalid unless they submit proof of identification. There are countless reasons why these military and overseas voters will be unable to cure their ballots nearly six months after casting them. Eaton Decl. ¶ 7. For example, voters may have relocated; servicemembers are often deployed or traveling for extended periods of time (which can prevent them from receiving notices or curing); and even if they can be contacted, deployed servicemembers and other voters may not have access to the required photo ID or technology needed to submit documentation to election officials. *Id.* In contrast to the disenfranchising burdens on these voters, the state has no valid—much less compelling—interest in making eligible voters jump through extra hoops months after they complied with existing rules in casting their ballots. *Alcorn*, 826 F.3d at 717.

16

The wholesale rejection of ballots cast by individuals entitled to vote under UMOVA is also an undue burden on the right to vote; indeed, in many instances, it is the complete revocation of that right. There is no state interest, let alone a compelling one, in retroactively disenfranchising hundreds of voters the North Carolina General Assembly specifically enfranchised, particularly when such voters have historically relied on this law to participate in elections for years.

## II. Voter Appellants will be irreparably harmed absent an injunction.

Commencing this unprecedented, burdensome, and likely unnecessary cure process stands to irreparably harm Voter Appellants and the voters they serve. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *LVW*, 769 F.3d at 247. "Discriminatory" voting procedures are precisely "the kind of serious violation[s] of the Constitution . . . for which courts have granted immediate relief." *Id.* That is precisely the case here, as only those UOCAVA voters in Guilford County will be subjected to an unconstitutional cure process, all while their neighbors and fellow-

17

servicemembers in the rest of the state remain unaffected. *See* Board Notice at 2 & n.2.

Rushing to begin a likely unlawful cure process before one is clearly necessary will also skew its results and suppress voter participation, including by VoteVets's constituents. Voters will be confused by the uncertain status of the cure, and others will not find it worth their while to participate in a burdensome cure process that might end up moot. And voters will surely know that ballot curing is not yet necessary: the Board's notices will "inform the voter that this litigation is ongoing and the voter's obligations are *subject to change*." Board Notice at 6 (emphasis added). Any cure process that begins before the federal issues in this case are fully resolved is thus likely to discourage voter participation.

Allowing this potentially needless cure to move forward risks the Board certifying an election result based on a tainted process, producing the same "cloud" upon the election's "legitimacy" that convinced the Supreme Court to stay the Florida recount until resolving the merits. *Bush*, 531 U.S. at 1047 (Scalia, J., concurring). "Count first, and rule upon legality afterwards, is not a recipe for producing election results that have the public acceptance democratic stability requires." *Id.* That

concern is particularly troubling here, as the 30-day cure process will almost certainly overlap with the district court's consideration of the merits. And it is almost guaranteed that some element of the district court's merits decision will become appealable during the cure window—layering even more uncertainty on voters and risking chaos if this Court subsequently reverses part or all of the district court's order.

In addition to skewing the results of this cure, the ensuing confusion will affect elections to come. Many voters—including both those who must cure and those who escaped Griffin's arbitrary challenges—will be less likely to vote in future elections. Eaton Decl. ¶¶ 10, 12. This is because the cure process will "likely create huge confusion among VoteVets constituents." *Id.* ¶ 8. The resulting harm will be particularly acute for VoteVets constituents because "[m]ilitary voters already vote at low rates compared to their civilian counterparts," *id.* ¶ 10; "adding after the fact requirements on just these voters" will likely "disillusion them," *id.* ¶ 12. The damage to future elections does not stop there. Just like *proceeding* with the unconstitutional Florida recount "threaten[ed] irreparable harm" "to the country" in *Bush*, proceeding with the unconstitutional cure here will do the same to all North Carolina voters.

19

*Bush*, 531 U.S. at 1047 (Scalia, J., concurring). The sensible way to avoid such lasting confusion and disillusionment is to fully resolve all outstanding questions, before putting the onus on voters to undertake steps that may be rendered completely unnecessary.

Any hasty cure program will also require VoteVets—which is dedicated to serving the very overseas and military voters targeted by the cure—to rapidly deploy scarce resources to help its constituents and supporters protect their ballots. Eaton Decl. ¶¶ 1, 6. These resources would otherwise have gone to other mission-critical efforts that will suffer as a result because VoteVets will "have less money and personnel resources available" to spend in these efforts. *Id.* ¶ 9. And these resources will likely be wasted, given the high probability that Voter Appellants' success on the merits will render the results of the cure process academic. The irretrievable loss of such scarce resources is classic irreparable harm. *See Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 361 (4th Cir. 1991); *UBS Fin. Servs., Inc. v. Zimmerman*, 2017 WL 2963445, at *2–3 (E.D.N.C. July 11, 2017) (finding irreparable injury where plaintiffs would be "forced to spend resources they cannot later recover" by "defending arbitration they [were] not legally obligated to participate

in"); *Md. Cas. Co. v. Realty Advisory Bd. on Lab. Rels*, 107 F.3d 979, 985 (2d Cir. 1997) (same).

### III.   The balance of equities favor an injunction.

The balance of equities and public interest cut sharply in favor of enjoining the Board. "[U]pholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). The public interest also favors permitting as many qualified voters as possible to cast a vote. *See LWV*, 769 F.3d at 247-48; *id*. at 244 (observing that "even one disenfranchised voter—let alone several thousand—is too many").

Staying the cure process will maintain the status quo. This will give the federal courts time to fully consider the weighty federal issues that remain unresolved in this case—issues that will likely eliminate the need for *any* cure process—before voters are confused, disillusioned, and subjected to unconstitutional requirements.

Allowing an unconstitutional cure process to begin is no mere administrative inconvenience—it sets North Carolina down a dangerous path where failed candidates can seek to thwart the will of the voters

21

through post-election gamesmanship. The harm to voters and the integrity of our elections cannot be overstated.

## CONCLUSION

Voter Appellants respectfully request that the Court enjoin the Board from issuing cure notices to voters that would start the 30-day cure clock until all outstanding federal questions have been resolved including, if necessary, through appeal.

April 16, 2025                    Respectfully submitted,

/s/ *Lalitha D. Madduri*
Lalitha D. Madduri
Christopher D. Dodge
Tina Meng Morrison
James J. Pinchak
Julie Zuckerbrod
ELIAS LAW GROUP LLP
250 Massachusetts Ave, N.W.
Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
lmadduri@elias.law
cdodge@elias.law
tmengmorrison@elias.law
jpinchak@elias.law
jzuckerbrod@elias.law

Narendra K. Ghosh
N.C. Bar No. 37649

22

PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

*Counsel for Intervenor-Appellants VoteVets Action Fund, the North Carolina Alliance for Retired Americans, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,396 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook.


Dated: April 16, 2025                           /s/ *Lalitha D. Madduri*
                                                Lalitha D. Madduri

                                                *Counsel for Intervenor-*
                                                *Appellants VoteVets Action*
                                                *Fund, the North Carolina*
                                                *Alliance for Retired Americans,*
                                                *Tanya Webster-Durham, Sarah*
                                                *Smith, and Juanita Anderson*

24

## CERTIFICATE OF SERVICE

On this 16th day of April, 2025, I electronically filed the foregoing using the Court's appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by that system.

/s/ *Lalitha D. Madduri*
Lalitha D. Madduri

*Counsel for Intervenor-Appellants VoteVets Action Fund, the North Carolina Alliance for Retired Americans, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson*