No. 25-1397(L), 25-1398

In the United States Court of Appeals
for the Fourth Circuit

JEFFERSON GRIFFIN,

*Plaintiff-Appellee,*

v.

ALLISON RIGGS, et al.,

*Intervenors-Appellants,*

and

NORTH CAROLINA STATE BOARD OF ELECTIONS,

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
for the Eastern District of North Carolina

———————————

**RESPONSE OF DEFENDANT-APPELLEE TO MOTION FOR
STAY AND INJUNCTION PENDING APPEAL**

———————————

Ryan Y. Park
Solicitor General

Nicholas S. Brod
James W. Doggett
Deputy Solicitors General

Terence Steed
Special Deputy Attorney General

*Counsel for Defendant-Appellee*

North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
(919) 716-6400

# INTRODUCTION*

This case returns to the Court after state-court proceedings that ordered the Board to commence a process that could retroactively disenfranchise up to roughly 1,600 North Carolina military and overseas voters—and perhaps many more. The district court below prohibited the Board from certifying the election results but otherwise declined to stop the Board from implementing a remedial process to identify the challenged voters, provide some of them with notice and an opportunity to cure, and identify ballots with votes that may be cancelled.

The Board is working diligently to implement this process and will continue to do so unless and until a court directs otherwise. But bound as it is by federal law, the Board agrees that this Court should enter an injunction pending appeal that prohibits the Board's implementation of the remedial process that the state courts have ordered.

---

\* This Court has ordered the Board to file responses to motions for stay and injunctive relief pending appeal in three cases: Nos. 25-1397(L), 25-1399, and 25-1401. As discussed below, the pending motions all raise substantially similar questions. *See infra* pp 13-16. The Board therefore submits the same response in all three cases.

The remedial process ordered by the state courts violates settled principles of federal constitutional law in multiple ways. It violates due process by canceling ballots from voters who followed all of the rules in place at the time of the election. *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983). It further violates due process by forbidding the Board from requiring an election protester to provide notice to a voter whose ballot is being challenged. *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 227 (M.D.N.C. 2020). It also violates equal protection by arbitrarily treating identically situated voters differently merely because they live in different counties. *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam). And it finally violates multiple civil-rights laws that limit the circumstances under which state officials may remove voters from the rolls or refuse to count their votes.

Implementing this remedial process now will also cause irreparable harm and run counter to the public interest. The Board and the county boards will be forced to invest time, money, and resources to identify and notify voters—efforts that will prove unnecessary if a court later concludes that the process violates federal law. Moreover,

2

ordering the Board to notify voters that their votes could be discarded—before a decision on whether such notice is legally permissible—is a recipe for voter confusion and public distrust of the election process.

The Board therefore agrees that an injunction pending appeal is appropriate to halt a process ordered by the state courts that requires state government officials to violate their citizens' federal constitutional and statutory rights.

## BACKGROUND

### A.    Judge Griffin challenges the election results, and the Board removes to federal court.

Judge Jefferson Griffin and Associate Justice Allison Riggs were candidates in the statewide 2024 general election for Associate Justice on the North Carolina Supreme Court.  Final canvassed results show that Justice Riggs prevailed by 734 votes.  N.C. State Bd. of Elections, *NC SBE Election Contest Details*, bit.ly/3PA7R6P (last visited Apr. 21, 2025).

On November 19, 2024, Judge Griffin filed election protests throughout the State challenging the election results. Two categories of protests are at issue here.[1]

First, Judge Griffin challenged 1,409 votes cast in one North Carolina county by military and overseas voters who did not submit a copy of their photo ID with their ballot. D.E. 1-4 at 12. At the time of the election, the North Carolina Administrative Code provided that military and overseas voters in the State were "*not* required to submit a photocopy of acceptable photo identification." 08 N.C. Admin. Code § 17.0109(d) (emphasis added). This photo ID rule had been applied in five prior elections. *See* D.E. 1-4 at 48. In the 2024 election, the majority of military and overseas voters used an online portal to submit their absentee ballots, but that portal was not configured to accept photo identification documentation. D.E. 61 at 3 n.3; *see* N.C. Gen. Stat. § 163-258.4(d) (authorizing the Board to "develop standardized absentee-voting materials, including privacy and transmission

---

[1]      As discussed below, the parties dispute the scope of these protests. *See infra* pp 11-12. This dispute does not, however, change the Board's federal-law arguments. *See infra* pp 18-23.

4

envelopes and their electronic equivalents" for military and overseas voters).

Second, Judge Griffin challenged 266 votes cast by military and overseas-citizen voters who have not lived in the United States but who the North Carolina legislature authorized to vote in state elections due to the voters' familial connection to the State. D.E. 1-4 at 12. At the time of the election, state law provided that these voters were eligible to cast a ballot in state elections. *See* N.C. Gen. Stat. § 163-258.2(1)(e). The state legislature unanimously passed this law in 2011. Uniform Military and Overseas Voters Act, N.C. Sess. Law 2011-182, bit.ly/4czpr5j. The law had been applied in more than forty prior elections. D.E. 1-4 at 40.[2]

The Board dismissed Judge Griffin's protests, concluding both that he had failed to comply with procedural filing requirements and that he had failed to establish probable cause of an election-law

---

[2] Judge Griffin also challenged roughly 60,000 voters who had allegedly incomplete voter registrations. The state supreme court rejected Judge Griffin's challenge to these voters on state-law grounds. *Griffin v. N.C. State Bd. of Elections*, No. 320P24-3, --- S.E.2d ---, 2025 WL 1090903, at *1-*2 (N.C. Apr. 11, 2025). This category of protests is therefore not at issue here.

5

violation.  D.E. 1-4 at 10-52.  Judge Griffin then filed petitions for

judicial review in North Carolina state trial court for each category of

protests.  D.E. 1-4; D.E. 1-12.  The Board removed the petitions to

federal district court.  D.E. 1.  The district court below held that the

Board properly removed under 28 U.S.C. § 1443(2).  D.E. 24.  The court

nonetheless abstained under *Burford v. Sun Oil Co.*, 319 U.S. 315

(1943), and remanded this matter back to state trial court.  D.E. 24.

The Board appealed.  D.E. 26.  This Court affirmed the district

court's holding that the Board correctly removed to federal court.

*Griffin v. N.C. State Bd. of Elections*, No. 25-1018(L), slip op. at 9 (4th

Cir. Feb. 4, 2025) (per curiam).  This Court also modified the district

court's abstention-based remand order.  Specifically, this Court

"direct[ed] the district court to modify its order to expressly retain

jurisdiction of the federal issues identified in the Board's notice of

removal should those issues remain after the resolution of the state

court proceedings, including any appeals."  *Id.* at 11 (citing *England v.

La. State Bd. of Med. Exam'rs*, 375 U.S. 411 (1964)).  Implementing this

Court's mandate, the district court modified its original order to abstain

under *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496

(1941), and to expressly retain jurisdiction over the federal issues.  D.E. 35.

### B. On remand, the state courts order the Board to implement a "cure process" and cancel certain ballots.

As the parties litigated the appeal from the district court's remand order, this case continued to proceed in state court.

On February 3, 2025, the Board submitted briefs in state trial court that raised arguments under both federal and state law for affirming the Board's decision to dismiss Judge Griffin's protests.  No. COA25-181, *Griffin v. N.C. State Bd. of Elections*, Documentary Exhibits to Record on Appeal, Vol. II, at 63-76, 175-223, 334-50 (N.C. Ct. App.), bit.ly/4jzXqNl.  The next day, this Court issued its decision modifying the district court's remand order to abstain under *Pullman* rather than under *Burford*.  The Board then promptly filed an *England* reservation in state trial court.  No. COA25-181, *Griffin v. N.C. State Bd. of Elections*, Record on Appeal at 128-33 (N.C. Ct. App.), bit.ly/41FOn7H.  This reservation informed the state trial court of the

Board's federal-law arguments but otherwise expressly reserved the Board's right to litigate the federal-law issues in a federal forum. *Id.*[3]

After the state trial court denied Judge Griffin's petitions for judicial review, the North Carolina Court of Appeals reversed over a dissent. *Griffin v. N.C. State Bd. of Elections*, No. COA25-181, 2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025). The court of appeals first reversed the Board's determination that Judge Griffin had failed to properly serve his protests on challenged voters under state law. It held that the Board lacked authority to enforce a Board rule requiring such service. *Id.* at *5-*6.

The court then held that, under state law, the two categories of voters at issue here voted unlawfully in the November 2024 general election. *Id.* at *11-*13. For military and overseas voters who did not include a copy of their photo ID or an exception affidavit with their absentee ballot, the court instructed the Board to: (1) identify and then notify those voters of their failure to meet the photo ID requirement, (2)

---

[3]    The Board reiterated its *England* reservation in its filings in the North Carolina Court of Appeals and the North Carolina Supreme Court. No. COA25-181, Response Br. at 81-83 (N.C. Ct. App. Feb. 27, 2025), bit.ly/3G9ovZx; No. 320P24-3, Pet. for Disc. Review at 3 n.2 (N.C. Apr. 6, 2025), bit.ly/43ZrBJk.

provide those voters fifteen business days from the date of the notice being sent to cure the defects, and (3) discard votes cast by those voters who fail to cure the alleged defects, but only for this contest and not any other race in the 2024 election. *Id.* at *14-*15. The court also instructed the Board to identify voters with inherited residency and remove their votes from the final vote total, again only in this contest. *Id.* at *15.

The Board petitioned the North Carolina Supreme Court for discretionary review of this decision. On April 11, the state supreme court issued an order that modified the decision in part and declined review in part. *Griffin v. N.C. State Bd. of Elections*, No. 320P24-3, --- S.E.2d ---, 2025 WL 1090903 (N.C. Apr. 11, 2025). The court modified the court of appeals decision by finding that military and overseas voters who failed to meet the photo ID requirement should have thirty calendar days to submit a copy of their photo ID or an exception affidavit. *Id.* at *3. The court also denied review of the court of appeals decisions holding that the protestor was not required to notify challenged voters and that the voters with inherited residency were

ineligible to vote in state elections and should have their votes cancelled. *Id.*

The state supreme court remanded to the state court of appeals "for further remand and actions not inconsistent with [the supreme court's] order." *Id.* On April 16, the court of appeals entered an order remanding the case to the state trial court, "for immediate further remand" to the Board. No. COA25-181, Certification of Judgment at 2 (Apr. 16, 2025). A concurring judge noted that the state-court orders "leave open the question of exactly to which voters [Judge Griffin's] challenges apply." *Id.* at 3 (Hampson, J., concurring in the result).

### C.    The Board complies with the state-court orders.

Until directed otherwise by court order, the Board is working diligently to comply with the state-court decisions.

The district court below ordered the Board to provide notice about the scope of its remedial efforts. Text Order of Apr. 12, 2025. In an April 15 response, the Board explained the steps that it intends to take to implement the state-court orders. D.E. 61. First, the Board explained how it will instruct county boards to identify the challenged voters at issue. D.E. 61 at 2-5. Second, the Board explained how the

challenged military and overseas voters who did not meet the photo ID requirement will receive notice about their need to submit a copy or an exception affidavit. D.E. 61 at 5-6. The Board has also "begun work with the vendor that maintains its online portal for processing military and overseas ballots to create a means by which voters may securely submit copies of photo IDs and exception forms online." D.E. 61 at 6. The Board estimated that this portal should "be ready within a week of entering into a contract." D.E. 61 at 6. Third, the Board explained how it will identify the ballots with votes that may be discounted. D.E. 61 at 6-7.

Judge Griffin disputes how the Board intends to implement the remedial process that the state courts have ordered. He has petitioned the North Carolina Court of Appeals for a writ of mandamus or, alternatively, moved that the court clarify the scope of its prior decision. No. COA25-181, Pet. for Writ of Mandamus and Alternative Motion to Clarify (N.C. Ct. App. Apr. 16, 2025), bit.ly/44t9hIG. He argues that his challenge to military and overseas voters who failed to meet the photo ID requirement encompasses voters in six of the State's 100 counties rather than one. *Id.* at 7-11. He argues that all military and overseas-

11

citizen voters who have not lived in the United States should be excluded from the vote count, not just the 266 voters who he identified in his election protests, including voters in counties in which he has never filed an election protest. *Id.* at 11-14. And he argues that the Board should not take further steps to identify these so-called "never resident" voters, despite recent public reporting that suggests that some have in fact previously resided in the State—reporting that has been initially verified by the Board's own internal review of voter records. *Id.* at 15-19.[4]

The Board believes that it is faithfully following the state-court orders in this case. The Board intends to file a response to the petition and motion by April 25, the deadline set by the North Carolina Court of Appeals. No. COA25-181, Order (N.C. Ct. App. Apr. 17, 2025), bit.ly/4jA7eXw.

---

[4] *See, e.g.*, Bryan Anderson, *Longtime N.C. Voters May Have Their Ballots Wrongfully Tossed in Supreme Court Race*, The Assembly (Apr. 13, 2025), bit.ly/4iqZAhk; Judd Legum et al., *North Carolina Supreme Court Throws Out Hundreds of Ballots Based on Flawed Data*, Popular Information (Apr. 15, 2025), bit.ly/3GaAKVt.

**D. The case returns to federal court, and the district court declines to stop the Board's implementation of the state-court orders.**

After the state supreme court decision, Justice Riggs returned to federal district court and moved for a preliminary injunction under Civil Rule 65 and an injunction under the All Writs Act, 28 U.S.C. § 1651. D.E. 37 at 1. Specifically, Justice Riggs sought an order "prohibiting the parties from taking any action to enforce or effectuate the North Carolina Court of Appeals' opinion," "as modified by the North Carolina Supreme Court," while the district court "considers the federal issues remaining after resolution of the state court proceedings." D.E. 37 at 1.

The district court granted the injunction only in part. The court prohibited the Board from "certify[ing] the results of the election, pending further order of [the] court." Text Order of Apr. 12, 2025. But the court otherwise ordered the Board "to proceed in accordance with the North Carolina Court of Appeals opinion, . . . as modified by the North Carolina Supreme Court." Text Order of Apr. 12, 2025. The court also entered a briefing schedule on the remaining federal-law

13

issues, with briefing set to conclude on April 28. Text Order of Apr. 12, 2025.

Justice Riggs appealed the denial of her motion to preliminarily enjoin the Board from implementing the state-court orders. D.E. 44. She also moved for a stay and an injunction pending appeal. D.E. 47. The district court denied the motions. As for the stay, the court held that a stay was "improper" because its order "did nothing more than decline to interfere (on an expedited basis and without the benefit of briefing) with the initiation of a remedial process ordered by the North Carolina Court of Appeals and North Carolina Supreme Court." D.E. 60 at 2. As for the injunction pending appeal, the court held that implementing the state-court orders while the appeal was pending would not, "on its own, constitute[ ] a form of irreparable harm" in light of the court's order "expressly prohibit[ing] the Board of Elections from certifying the results of the election" until the federal-law issues have been resolved. D.E. 60 at 3.

Justice Riggs now moves this Court for a stay and an injunction pending appeal. *See* Fed. R. App. P. 8.

14

Three other similar motions are also before this Court. The first is from voter-intervenors, who also appealed the district court's denial of preliminary injunctive relief. D.E. 45. This Court has consolidated that appeal with Justice Riggs's. Nos. 25-1397(L), 25-1398.

The remaining motions arise from separate cases brought against the Board in federal court. First, the North Carolina Democratic Party sued the Board under 42 U.S.C. § 1983, seeking an order prohibiting the Board from canceling the votes that Judge Griffin challenged. *N.C. Democratic Party v. N.C. State Bd. of Elections*, No. 24-cv-699, D.E. 35 (E.D.N.C.). Second, a putative class of military and overseas voters who did not present photo ID and whose votes Judge Griffin challenged sued the Board's Members and its Executive Director under 42 U.S.C. § 1983, seeking similar relief. *Conley v. Hirsch*, No. 25-cv-193, D.E. 1 (E.D.N.C.). The district court held that these cases "[i]nvolve . . . common question[s] of law or fact" with the *Griffin* litigation and consolidated them with this case. Text Order of Apr. 14, 2025; *see* Fed. R. Civ. P. 42(a). Both the Democratic Party and the *Conley* plaintiffs appealed from the district court's order that the Board proceed with

15

implementing the state-court decisions.  D.E. 49, 51.  This Court has
separately docketed those appeals as Nos. 25-1399 and 25-1401.

All four motions raise the same underlying question: whether this
Court should enter an order prohibiting the Board from implementing
the challenged remedial process while the appeals are pending.  Given
this overlap, the Board respectfully submits the same response across
all the pending cases.

## JURISDICTIONAL STATEMENT

In Nos. 25-1397(L) and 25-1398, the district court had jurisdiction
under 28 U.S.C. § 1443(2).  *Griffin*, No. 25-1018(L), slip op. at 9.  In
Nos. 25-1399 and 25-1401, the district court had jurisdiction over the
section 1983 actions under 28 U.S.C. § 1331.

This Court has appellate jurisdiction in all four cases under 28
U.S.C. § 1292(a)(1).  That provision authorizes a court of appeals to
exercise jurisdiction over "[i]nterlocutory orders . . . granting,
continuing, modifying, refusing or dissolving injunctions, or refusing to
dissolve or modify injunctions."  28 U.S.C. § 1292(a)(1).

Here, the district court below denied motions for a preliminary
injunction prohibiting the Board from implementing the remedial

16

process ordered by the state courts.  Specifically, although the district court prohibited the Board from "certify[ing] the results of the election," the court nonetheless declined to enjoin the Board from "proceed[ing] in accordance with" the state-court orders.  Text Order of Apr. 12, 2025. Thus, until directed to do otherwise by court order, the Board has begun the process of preparing to identify the challenged voters, notifying certain challenged voters of an opportunity to cure, and identifying the ballots with votes that may be discounted.  D.E. 61.  The district court's order therefore has the "practical effect" of denying an injunction that would prohibit the Board from taking these steps.  *Abbott v. Perez*, 585 U.S. 579, 594 (2018) (citations omitted).  The order is immediately appealable as a result.  *See id.*

## ARGUMENT

The Board agrees that an injunction pending appeal is warranted.

In deciding whether to grant an injunction pending appeal, this Court considers the likelihood of success on the merits, the irreparable harm that could result absent an injunction, the balance of equities, and the public interest.  *Wise v. Circosta*, 978 F.3d 93, 102-03 (4th Cir. 2020) (en banc).  This standard is particularly "demanding" when a party

17

seeks an appellate injunction, but the movants have satisfied the standard here. *Grimmett v. Freeman*, No. 22-1844, 2022 WL 3696689, at *1 (4th Cir. Aug. 25, 2022) (per curiam); *see Nken v. Holder*, 556 U.S. 418, 429 (2009).

*First*, the Board's implementation of the state-court orders would violate the federal constitution. It is "settled" law that the Fourteenth Amendment's Due Process Clause prohibits a state election from "reach[ing] the point of 'patent and fundamental unfairness.'" *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (quoting *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978)). Specifically, voters who do "no more than follow[ ] the instructions of the officials charged with running the election" cannot, consistent with due process, be retroactively disenfranchised because a court later concludes that those instructions were incorrect. *Burns*, 570 F.2d at 1075.

Here, the state-court orders require the Board to carry out a process that is fundamentally unfair. It is undisputed that the challenged voters did everything they were asked to cast a ballot in the November 2024 general election. A Board rule in place at the time, and enforced without controversy in multiple prior elections, told military

and overseas voters that they did not need to submit a copy of their photo ID or an exception affidavit with their ballot. 08 N.C. Admin. Code § 17.0109(d). Indeed, a majority of these voters used an online platform to cast their ballots that did not provide them with the means to submit a copy of their photo ID or exception form. D.E. 61 at 3 n.3. Similarly, a state statute in place at the time of the election, and enforced without controversy for more than a decade, told inherited-residency voters that they were eligible to participate in state elections. N.C. Gen. Stat. § 163-258.2(1)(e).

To commence a process that will lead to retroactively cancelling votes cast in compliance with longstanding election rules in place at the time of the election—more than five months after the election has ended—violates due process under longstanding precedent. As this Court has explained, to avoid a due-process violation, "the general rule [is to] den[y] relief with respect to past elections," while "afford[ing] prospective relief" instead. *Hendon*, 710 F.2d at 182. A contrary rule "would permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Id.*

19

(quotation marks and citation omitted).  That is exactly what the state-court orders have permitted here.  Whatever the precise scope of Judge Griffin's protests, *see supra* pp 11-12, the Board cannot carry out the remedial process without violating the federal constitution's due-process guarantees.

The state-court orders also deny voters their right to procedural due process.  The state court of appeals held that the Board lacks statutory authority to require election protesters like Judge Griffin to notify voters that their votes are being challenged.  That holding offends due process because voters have a "constitutionally protected liberty interest" in their right to vote.  *Democracy N.C.*, 476 F. Supp. 3d at 227.  As a result, when a voter's "ballot [is] challenged," due process requires that voters be "given notice," so they can protect their vote.  *Id.* at 228.[5]

---

[5]    Judge Griffin also reads the decision of the state court of appeals to exacerbate the procedural due process problem here.  If the remedial process is not enjoined, the Board intends to provide notice to those voters that Judge Griffin has challenged as "never residents" and to allow them an opportunity to show that they are or have been residents of North Carolina.  D.E. 61 at 3-5.  Judge Griffin, however, has asked that court to construe its mandate to require the Board to cancel the votes of all these voters, without any notice or process.  Pet. for Writ of Mandamus at 15-19, bit.ly/44t9hIG.  The Board disagrees with that reading of the state-court mandate, but if Judge Griffin were correct, it would clearly deny those voters procedural due process.

It is also well established that, under the Fourteenth Amendment's Equal Protection Clause, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam); *see Wise*, 978 F.3d at 100 & n.7 (stating that *Bush* "is of limited precedential value" given its fact-specific analysis but acknowledging that it "prohibits arbitrary and disparate treatment in the valuation of one person's vote in relation to another's").  By ordering the Board to implement a cure process that could result in the cancellation of ballots cast by military and overseas voters in at most six of the State's 100 counties, the state-court orders require the Board to treat identically situated voters differently for the arbitrary reason that they live in one county rather than another.  But the law is clear that a State cannot, in carrying out an election, "accord[ ] arbitrary and disparate treatment to voters in its different counties." *Bush*, 531 U.S. at 107; *accord Reynolds v. Sims*, 377 U.S. 533, 563 (1964) ("Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable.").

21

The Board's implementation of the state-court orders would also violate multiple federal civil-rights laws. For example, the National Voter Registration Act prohibits officials from "systematically remov[ing]" ineligible voters from the rolls within 90 days of an election, except in narrow, enumerated circumstances. 52 U.S.C. § 20507(c)(2)(A)-(B); *see* N.C. Gen. Stat. § 163-82.14(a1) (extending this requirement to state elections). To enforce Congress's prophylactic prohibition against voter purges for the 90-day period before an election, courts cannot require a State to retroactively implement mass voter purges *after* an election has occurred—as the remedial process would have the Board do with respect to inherited-residency voters.

Implementing the state-court orders would also violate the Voting Rights Act, which prohibits officials from "willfully fail[ing] or refus[ing] to tabulate, count, and report" the votes of individuals who were "qualified to vote" in the election. 52 U.S.C. § 10307(a). It is undisputed that the military and overseas voters who failed to present photo ID were qualified voters. The Voting Rights Act therefore

mandates that their votes be counted.[6]

Second, irreparable harm will result absent an injunction. "Running elections state-wide is extraordinarily complicated and difficult." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). "Those elections require enormous advance preparations by state and local officials, and pose significant logistical challenges." *Id.* The state-court orders here—requiring the Board to take further steps in administering an election that ended more than five months ago—pose significant logistical challenges of this kind. To comply with the state-court orders, the Board and the county boards will be required to spend time, money, and resources to implement a process for identifying and notifying challenged voters, as well as identifying ballots with votes that may be discounted. D.E. 61. If the district court or this Court later concludes that implementing the state-court orders would violate federal law, these efforts would be for

---

[6]    In addition, Judge Griffin reads the state court of appeals' decision to require the Board to disregard evidence that some voters that he challenged as "never residents" actually are or have been state residents and are therefore qualified to vote. If Judge Griffin were correct in this reading, it would require the Board to cancel votes of qualified North Carolina voters in violation of the Voting Rights Act.

naught. Any costs incurred during this process, moreover, cannot be recovered at the end of this litigation and are therefore irreparable harms. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 218 (4th Cir. 2019). The district court was therefore incorrect that its order prohibiting the Board from certifying the election results was sufficient to avoid irreparable harm here. D.E. 60 at 3.

Irreparable harm will also flow absent an injunction in the form of voter confusion. "Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). That risk is especially acute here. This case is now before three different courts: this Court, on motions for an injunction and plenary appeals from the denial of preliminary injunctive relief below; the district court, where the parties are briefing the remaining federal issues; and the state court of appeals, where the parties are clarifying the scope of the remedial process. Prohibiting the implementation of the remedial process until the courts have resolved these disputes will guard against "voter confusion." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam).

24

After all, implementing the remedial process will require sending notice to affected voters that their votes could be canceled. Voters who receive that notice would be understandably confused by having to take steps to protect their vote before courts have decided whether those steps are actually necessary. The notices would, moreover, threaten voters with retroactive disenfranchisement—and a threat to carry out an unconstitutional order imposes irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (finding irreparable harm when constitutional rights were "threatened or in fact being impaired at the time relief was sought").

*Third*, the balance of equities weighs in favor of granting relief. While entering an injunction will delay the remedial process, "that consequence is attributable at least in part to [Judge Griffin], [who] delayed unnecessarily" in bringing his challenges to longstanding election rules until after the election. *See Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2617 (2020) (Roberts, C.J., concurring) (quotation marks omitted). And the parties agree that the Board should be allowed to continue preparatory steps that will enable it to promptly begin the remedial process should it be appropriate, minimizing any delay.

*Fourth*, an injunction is in the public interest. Implementing a state election process "of questionable legality . . . cast[s] a cloud upon" "the legitimacy of [the] election." *Bush v. Gore*, 531 U.S. 1046, 1047 (2000) (Scalia, J., concurring). "Count first, and rule upon legality afterwards, is not a recipe for producing election results that have the public acceptance democratic stability requires." *Id.*

\* \* \*

As this Court has recently observed, "the constant pull to the courtroom leaves state election officials frequently operating in a provisional state, never knowing if and when their procedures will be overturned." *Sharma v. Hirsch*, 121 F.4th 1033, 1043 (4th Cir. 2024). "This state of affairs is not conducive to the most efficient administration of elections." *Id.*

It is difficult to imagine a case that more squarely implicates that concern. By pausing the implementation of the remedial process, this Court can ensure the orderly resolution of any remaining federal issues and the remedy's scope—before the Board and the county boards invest resources to fully carry out the process, and before voters take steps to comply with a process that violates federal law.

26

## CONCLUSION

For these reasons, the Board agrees that this Court should issue an injunction pending appeal.

Respectfully submitted, this the 21st day of April 2025.

Ryan Y. Park
Solicitor General

/s/ Nicholas S. Brod
Nicholas S. Brod
Deputy Solicitor General

James W. Doggett
Deputy Solicitor General

Terence Steed
Special Deputy Attorney General

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602
(919) 716-6400

*Counsel for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE

I certify that this response complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because it contains 5,175 words. This response complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a proportionally spaced typeface: 14-point Century Schoolbook font.

Respectfully submitted, this the 21st day of April 2025.

/s/ Nicholas S. Brod
Nicholas S. Brod

## CERTIFICATE OF SERVICE

I certify that on April 21, 2025, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Respectfully submitted, this the 21st day of April 2025.


/s/ Nicholas S. Brod
Nicholas S. Brod